**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BIAGIO RAVO and ENRICO NICOLO, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 11-1637 |
| | ) | |
| v. | ) | Chief Judge Joy Flowers Conti |
| | ) | |
| COVIDIEN LP, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

In this case, inventors Biagio Ravo and Enrico Nicolo (collectively "Ravo") assert claims for patent infringement and accuse Covidien LP ("Covidien") of infringing United States Patent No. 6,117,148 (the "'148 Patent"), entitled Intraluminal Anastomotic Device. The '148 Patent describes two embodiments of a surgical device that can be used to resect a section of bowel (or any hollow organ) through intussusception followed by anastomosis, in turn preventing the intraluminal contents from contaminating the body cavity. (ECF No. 54 at 1.)

## I.    Background

Following a period of expert discovery, Ravo and Covidien both filed motions challenging the qualifications or opinions of the opposing party's expert witness. Ravo challenged, on numerous grounds, the opinion of Henry Bolanos ("Bolanos") that the asserted claims of the '148 Patent are invalid because they fail to satisfy the written description and enablement requirement of 35 U.S.C. § 112. (ECF No. 88.) Covidien, in two separately-filed motions, challenged, on numerous grounds, the opinions of Luca Passaggio ("Passaggio") that (a) the asserted claims of the '148 Patent are valid and infringed, and (b) the reasonable royalty rate for the '148 Patent is an up-front payment of 5% of Covidien's projected revenue from sales

of the accused device in the third or fourth year after introduction of the product to market, plus a running royalty of not less than 5% of revenue from sales of the Covidien device for the first five years of commercialization, which rate would be reduced to 2% or 3% for the remaining life of the patent. (ECF Nos. 90 and 93.) The court held hearings on these motions on July 24, 2014 (the "July Hearing"), and August 29, 2014 (the "August Hearing"), ruling on many, but not all, these challenges. (ECF Nos. 101 and 106.)

Following the July Hearing, the court directed further briefing with respect to the admissibility of Bolanos' opinion that Claim 9 of the '148 Patent is invalid, and instructed Ravo to determine whether Passaggio could obtain copies of several prior license agreements that he referenced in his expert report. (7/24/2014 Minute Entry.) Following the August Hearing, the court ordered the parties to submit supplemental briefing with respect to Covidien's motion to exclude Passaggio's damages opinion. (8/29/2014 Minute Entry.) The court limited that briefing to the following two issues: (1) whether an expert can testify, from memory, concerning past transactions or situations in which he was involved or of which he is aware, without producing documentation, whether generally or in the specific context of a patent damages expert; and (2) what specific evidence of record exists to satisfy Ravo's burden to prove that the other licenses relied upon in Passaggio's expert report are sufficiently comparable to the relevant hypothetical license negotiation. (Id.) At the August Hearing, the parties agreed to rest on the record, with the addition of the supplemental briefing, but without the need for further oral argument, or an evidentiary hearing, on the two outstanding challenges. (ECF No. 106 at 6-12.)

## II.    Bolanos' Opinion that Claim 9 is not Enabled

### A.    Bolanos' Opinion

In his expert report, Bolanos opines that the "ligation members 26 cannot qualify as the band required by claim 9," and that "band 72 cannot qualify as the band required by claim 9," leading to his ultimate conclusion that Claim 9 is invalid as not enabled. (ECF No 89-1 at 42-44 (¶¶ 103-107).)  Claim 9 recites "[t]he surgical device of claim 1 further including a band for attaching the lumen to said luminal attachment and intussesception means." (ECF No. 66-1 at 12.)

### B.    Ravo's Objections

Ravo objects to these proffered opinions on the ground that Bolanos cannot base his conclusion that Claim 9 of the '148 Patent is not enabled on a factual predicate that contradicts this court's additional claim construction, in which the court concluded that Claim 9 claims the item 72 attachment band. (ECF No. 89 at 7-8; <u>see</u> ECF No. 73 at 5-6.)  In response, Covidien argues that this court's additional claim construction of the term "band" did not assess whether the band performed any particular function set forth in Claim 9, and that Bolanos' opinion is directed to that still-disputed point. (ECF No. 99 at 11-12.)  Covidien notes that it always contended that Claim 9 was invalid, regardless of how the court construed the term "band." (<u>Id.</u> at 12-13.)

### C.    The Law

An expert can offer an opinion on how a court's claim construction should be applied to the facts of a case, but cannot offer an opinion that contradicts or disregards a court's claim construction rulings. <u>Personalized User Model LLC v. Google, Inc.</u>, No. 09-525, 2014 WL

807736, at *1 (D. Del. Feb. 27, 2014); <u>CMU v. Marvell Tech. Grp., Ltd.</u>, No. 09-290, 2012 WL 5451495, at *1-2 (W.D. Pa. Nov. 7, 2012).

### D.  **Analysis**

Ravo is correct that this court, in its additional claim construction decision, stated that "claim 9…claims the item 72 attachment band," which band is distinct from the "item 26 ligation member band" that was considered during previous claim construction proceedings. (ECF No. 73 at 6.)  Bolanos' statement in paragraph 104 of his expert report that the "band 72 cannot qualify as the band required by claim 9" does directly contradict this court's additional claim construction ruling. (ECF No 89-1 at 43 (¶ 104).)

In an attempt to avoid the conflict between Bolanos' opinion and this court's additional claim construction, Covidien states, in its supplemental briefing, that it:

> will not seek to elicit testimony from Mr. Bolanos that is contrary to this Court's claim construction.  Covidien and Mr. Bolanos agree that item 72 is a 'continuous ring of material that is capable of expanding and contracting' and, thus, is a 'band' under the construction provided by this Court.  What Covidien disputes is that item 72, as disclosed in the '148 patent specification, supports all of the additional limitations in claim 9.

(ECF No. 102 at 3-4.)  In other words, according to Covidien, Bolanos' opinion is that Claim 9 of the '148 Patent is invalid because the patent does not disclose an "item 72 attachment band" that performs the function of "attaching the lumen to said luminal attachment and intussusception means." (ECF No. 66-1 at 12 (the '148 Patent).)  Covidien suggests that the substance of Bolanos' opinion can be clarified by striking the last sentence from paragraphs 103 and 104 of his expert report. (ECF No. 102 at 3.)  Covidien characterizes these sentences as "shorthand for the full language of claim 9," and contends that by striking them this "confusing" shorthand will be eliminated. (<u>Id.</u> at 7.)  Ravo asserts that Covidien's argument as "circular."

(ECF No. 103 at 5-6.) According to Ravo, arguing that the item 72 band does not perform the functions set forth in Claim 9 is the same thing as arguing that the item 72 band cannot be the band claimed in Claim 9, which inescapably contradicts this court's determination in the additional claim construction decision that the band claimed in Claim 9 is the item 72 attachment band.[1] (Id.)

The court permitted Ravo to add Claim 9 to its list of asserted claims following claim construction. (ECF No. 73 at 2.) Upon doing so, the court was asked to construe two terms that appeared in Claim 9, but were not construed in this court's original claim construction opinion: (1) "surgical device;" and (2) "band." (Id.) To reiterate, Claim 9 recites "[t]he surgical device of claim 1 further including a band for attaching the lumen to said luminal attachment and intussesception means." (ECF No. 66-1 at 12.)

The court found that the term "surgical device" required no further construction, and that the term "band" meant "a continuous ring of material that is capable of expanding and contracting." (ECF No. 73 at 2, 5.) Before construing the term "band," however, the court made the following observations:

> ... the court must clarify that the '148 Patent refers to two different structural elements that can take the form of a band. The first is "the ligation member 26 which can be a conventional suture thread, a flexible band or the like." '148 Patent, 4:3-4. The second is "an expandable band or loop 72" that is an attachment mechanism used in conjunction with "a plurality of carrier arms" in one version of the second embodiment of the device. '148 Patent, 6:12-13, 18-20, 54-56; Figs. 6 & 7; cls. 9, 10, 19. Yet the parties, at times, refer to these two kinds of bands interchangeably in their written claim construction submissions. For instance, Ravo freely substitutes these two different items in its opening

---

[1] Ravo also makes two arguments that attack the substance of Bolanos' invalidity opinion (ECF No. 103 at 6-7.) These arguments, apart from not having been made in Ravo's opening briefing challenging Bolanos' expert opinion, go to the merits, and are properly considered, if at all, in the context of summary judgment motions. They will not be addressed at this juncture.

claim construction brief, (ECF No. 66 at 10-12), despite having recognized in its brief opposing Covidien's motion to strike Claim 9 that item 26 and item 72 are two different bands. (ECF No. 59 at 9-10.) The item 26 ligation member bands and the item 72 attachment bands are entirely different structural elements. The court's prior claim construction opinion addressed the former, but not the latter.

In its prior claim construction opinion, this court found that the item 26 ligation member band was not part of the structure corresponding to the "luminal attachment and intussusception means." (ECF No. 54 at 10-11.) *The prior claim construction opinion did not address the item 72 attachment bands because Claims 9, 10, and 19, which claim the item 72 "bands for attaching" and "attachment bands," were not asserted at the time the court issued that opinion. '148 Patent, 8:17-13, 60-63; (ECF No. 48-1.) Ravo now asserts Claim 9, which claims the item 72 attachment band. As such, any discussion in this court's prior claim construction opinion regarding the item 26 ligation member band,* including specifically its independence from the "device" claimed in the preamble of independent Claims 1 and 15, *is separate and distinct from the court's instant discussion of the item 72 attachment band claimed in Claim 9.*

Having clarified this distinction between the item 26 and 72 bands, the court must now determine the appropriate construction to assign to the term "band," as used in Claim 9.

(Id. at 5-6) (emphasis added).) According to Ravo, the court's statements to the effect that Claim 9 claims the item 72 attachment band prevent Covidien from challenging the validity of Claim 9. (ECF No. 103 at 5-6.) Ravo is incorrect.

As is reflected in the passage reproduced above, to the extent that the additional claim construction decision referred to the item 72 attachment band as the band claimed in Claim 9, that reference was made in order to distinguish it from the item 26 ligation member band, which appeared in the claims previously asserted by Ravo. (ECF No. 73 at 5-6.) Under no fair reading of this court's additional claim construction opinion did this court assess whether the '148 Patent discloses or enables each claim limitation found in Claim 9, which claim requires

that the item 72 attachment band be "for attaching the lumen to said luminal attachment and intussesception means." (ECF No. 66-1 at 12.) The court construed this means-plus-function claim limitation in the original claim construction decision as follows:

> The function shall be: '1) for attaching a portion of the lumen wall to be removed; and 2) for inverting a portion of the lumen wall to be removed.' (ECF No. 48-2.) The structure is construed separately for both embodiments. Embodiment #1 is 'an annular groove located on the central post and independently movable with respect to a housing over or around which the lumen wall is inverted.' Embodiment #2 is 'an annular groove located on the housing and a stapling assembly that move relative to one another.' (ECF No. 48-2.)

(ECF No. 54 at 13-14.) Ravo's contention that, by distinguishing the item 72 attachment band of Claim 9 from the item 26 ligation member band of Claims 1-3, 5, 11-13, and 15-16, this court held, in a claim construction decision, that all elements of Claim 9 were adequately disclosed is factually and legally flawed. (ECF No. 45.) The court reached no such holding in the additional claim construction decision, which is understandable given that the purpose of claim construction is to construe the claims, not to determine whether a patent is valid in light of that construction. Markman v. Westview Instruments, Inc., 52 F.3d 967, 996 n.7 (Fed. Cir. 1995).

In his expert report, Bolanos states his understanding of how the item 72 band interacts with the device and an organ's tissue, and opines that the '148 Patent does not disclose or enable an item 72 attachment band that performs the task of "attaching the lumen to said luminal attachment and intussusception means," making Claim 9 invalid. (ECF No 89-1 at 43 (¶ 104).) This is a proper matter for expert opinion. A fact-finder can accept it, or reject it, in whole, or in part. Striking the last sentence of paragraph 104 of Bolanos' expert report, as Ravo proposes, clarifies that opinion, and eliminates any potential conflict with this court's additional claim construction. (Id.; ECF No. 102 at 3.)

Covidien, however, is incorrect that striking the last sentence of paragraph 103 will likewise cure any defect in the opinion that Bolanos offers in that paragraph. Paragraph 103 analyzes why the item 26 ligation member band does not perform the tasks set forth in Claim 9, and therefore cannot "qualify as the band required by claim 9." (ECF No. 89-1 at 42-43 (¶ 103).) As reproduced above, however, the court's additional claim construction decision was grounded in the premise that Claim 9 claims the item 72 attachment band, and not the item 26 ligation member band. (ECF No. 73 at 5-7.) In that context, Bolanos' opinion that the item 26 ligation member band does not satisfy all the limitations of Claim 9 is inconsequential. For this reason, paragraph 103 of Bolanos' expert report must be stricken in its entirety. (ECF No. 89-1 at 42-43 (¶ 103).)

With the changes described above, Bolanos can testify in conformance with his expert report without contradicting this court's additional claim construction decision. Those of Ravo's objections to Bolanos' expert report that were not disposed of on the record at the July Hearing are overruled, except as otherwise stated immediately above.

## III.  Passaggio's Reasonable Royalty Rate Opinion

### A.  Passaggio's Opinion

In his expert report, Passaggio opines that the reasonable royalty rate for the '148 Patent is an up-front payment of approximately 5% of Covidien's projected revenue from sales of its device in the third or fourth year after introduction of the product to market, plus a running royalty of not less than 5% of revenue from sales of the Covidien device for the first five years of commercialization, which rate would be reduced to 2% or 3% for the remaining life of the patent. (ECF No 95-5 at 11 (¶¶ 57-58); ECF No. 97 at 15.) Passaggio submits that the following

medical device licensing agreements, in which he was personally involved, or of which he is personally aware, support his expert opinion:

1) "One of [his] customers, an Italian company" is paying a 15% royalty on sales of a device for the treatment of hemorrhoidal disease, without any upfront payment. (ECF No. 95-5 at 10 (¶ 55)); and

2) A "Swiss company [he] was working with" offered to a general surgeon a royalty of 5%, decreasing to 3% after a certain financial threshold was met, "on a new inquinal hernia prosthesis (no big innovation there), but with an up-front payment." (Id.)

Passaggio states, based upon his "experience," that royalty rates "may vary" from 2% to 15%, depending on whether an up-front payment is made, (id. (¶ 55)), and "often" decrease below 5% after 5 years in the field of orthopedic implants, (id.), that "it is very common" for medical device manufacturers to begin licensing negotiations "in the 8-10% range," (id.), and that large companies, "like Covidien…commonly offer a running royalty in the 2-3% range," (id. (¶ 56)). Passaggio also explains that "[Ravo] previously licensed the '148 Patent to Ethicon Endo-Surgery for a substantial sum of money. Since that license was the result of settlement of a prior infringement lawsuit… the amount paid by Ethicon may not be indicative of a reasonable royalty." (Id. (¶ 57).)

## B. **Covidien's Objections**

Covidien objected to Passaggio's expert report with respect to damages on various grounds, including that: (1) he applied no methodology to assess damages at all; (2) he relies on "other licenses" a) that were not produced in discovery, and b) for which he makes no showing of comparability or technological relevance; (3) he fails to allocate damages to the

patented features of the Covidien devices and kits; and (4) he is not qualified to opine on the subject to damages. (ECF No. 91.)

The court finds, based upon the written record, and oral argument presented at the July Hearing, that Passaggio is qualified to offer expert testimony about licensing in the medical device field based upon his extensive professional experience. Objection four is, therefore, overruled. The court disposed of objections one and three at the July Hearing by finding that if Passaggio was permitted to testify with respect to damages, his testimony would be limited to establishing the reasonable royalty *rate*, and he could not opine on the amount of monetary damages that should be ultimately awarded in this case. (ECF No. 101 at 25-27, 30-32, 37, 43-46, 47.) Ravo conceded this point in its written submissions, and at the July Hearing. (ECF No. 100 at 14; ECF No. 101 at 44-45.)

Objection number two remains outstanding. To reiterate, Covidien contends that Passaggio cannot opine with respect to the reasonable royalty rate in this case because the other licenses on which he relies were not produced in discovery, and because, in any event, Passaggio's expert report fails to establish that those licenses are comparable. (ECF No. 92 at 11-13.) The court heard oral argument with respect to Covidien's contentions at the July Hearing and directed Ravo to attempt to obtain copies of the "Swiss" and "Italian" license agreements to which Passaggio referred in his expert report. (ECF No. 101 at 39-68.) Upon being informed at the August Hearing that Passaggio was unable to obtain copies of those license agreements, and that Ravo wished to rest on the record made at the July Hearing, the court ordered the parties to supplement their briefing on the issues raised by objection number two. (ECF Nos. 107, 108.) The court directed that such supplemental briefing be limited to "two issues: (1) whether an expert can testify, from memory, concerning past transactions or situations in which he was

involved or of which he is aware, without producing documentation, whether generally or in the specific context of a patent damages expert; and (2) what specific evidence of record exists to satisfy Ravo's burden to prove that the other licenses relied upon in Passaggio's expert report are sufficiently comparable to the relevant hypothetical license negotiation." (8/29/2014 Minute Entry.)

### C. <u>The Law</u>

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Awarding damages through litigation attempts to assess "the difference between the patentee's pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." <u>Yale Lock Mfg. Co. v. Sargent</u>, 117 U.S. 536, 552 (1886). The burden of proving damages falls on the patentee. <u>Dow Chem. Co. v. Mee Indus., Inc.</u>, 341 F.3d 1370, 1381 (Fed. Cir. 2003); <u>Kearns v. Chrysler Corp.</u>, 32 F.3d 1541, 1551 (Fed. Cir. 1994). Damages can be proven using two alternative methods: lost profits, and the reasonable royalty. A reasonable royalty is the floor below which damages shall not fall. <u>Bandag, Inc. v. Gerrard Tire Co.</u>, 704 F.2d 1578, 1583 (Fed. Cir. 1983).

A reasonable royalty may be based upon either an established royalty for the patent-in-suit, if there is one, or, if not, upon a hypothetical negotiation. <u>Lucent Tech., Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The most common approach to proving a reasonable royalty is the hypothetical negotiation or "willing licensor-willing licensee" approach, which attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began. <u>Georgia–Pacific Corp. v.

U.S. Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970).  One way to establish the

reasonable royalty that would have resulted from the hypothetical negotiation is to rely on

license rates paid for comparable patents, which is commonly referred to as Georgia-Pacific

factor #2.[2]

   As is inherent in that factor, any other licenses relied upon to support a reasonable

royalty analysis must be proven to be sufficiently comparable to the hypothetical license at issue

with respect to technology, economic terms, and time period. Apple v. Motorola, Inc., 757 F.3d

1286, 1315 (Fed. Cir. 2014) (licenses must be comparable in order to be used as a reliable basis

on which to assess a royalty rate); Lucent, 580 F.3d at 1325.  The asserting expert has the duty to

demonstrate comparability. CMU v. Marvell Tech. Grp., No. 09-290, 2012 WL 3686748, at * 4

(W.D. Pa. Aug. 24, 2012) (citing district court decisions).  Once the expert shows some

"discernible link between the comparable license and the claimed technology," distinctions and

---

[2] For purposes of completeness, the fifteen Georgia–Pacific factors are: "(1) royalties the patentee has received for licensing the patent to others; (2) rates paid by the licensee for the use of comparable patents; (3) the nature and scope of the license (exclusive or nonexclusive, restricted or nonrestricted by territory or product type); (4) any established policies or marketing programs by the licensor to maintain its patent monopoly by not licensing others to use the invention or granting licenses under special conditions to maintain the monopoly; (5) the commercial relationship between the licensor and licensee, such as whether they are competitors; (6) the effect of selling the patented specialty in promoting sales of other products of the licensee; (7) the duration of the patent and license term; (8) the established profitability of the product made under the patent, including its commercial success and current popularity; (9) the utility and advantages of the patent property over old modes or devices; (10) the nature of the patented invention and the benefits to those who have used the invention; (11) the extent to which the infringer has used the invention and the value of that use; (12) the portion of profit or of the selling price that may be customary in that particular business to allow for use of the invention or analogous inventions; (13) the portion of the realizable profit that should be credited to the invention as opposed to its non-patented elements; (14) the opinion testimony of qualified experts; and (15) the results of a hypothetical negotiation between the licensor and licensee." Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 26-27 & n.11 (Fed. Cir. 2012) (reciting the Georgia–Pacific factors).

oversights are matters for cross-examination. CMU, 2012 WL 3686748, at * 4 (citing

ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 870 (Fed. Cir. 2010)).

Settlement agreements are generally not relevant "because in the usual course

they do not provide an accurate reflection of what a willing licensor would do in an arm's length

transaction." LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 77-78 (Fed. Cir.

2012); Uniloc USA, Inc. v. Microsoft Corp., 632 F.Supp.2d 147, 159 (D.R.I. 2009). "The notion

that license fees that are tainted by the coercive environment of patent litigation are unsuitable to

prove a reasonable royalty is a logical extension of Georgia-Pacific, the premise of which

assumes a voluntary agreement will be reached between a willing licensor and a willing licensee,

with validity and infringement of the patent not being disputed." LaserDynamics, 694 F.3d at 77-

78.

### D. **Analysis**

Covidien's outstanding objection to Passaggio's damages opinion has a

procedural component and a substantive component.  First, Covidien contends that Passaggio

cannot proffer an expert opinion about the reasonable royalty rate because his opinion is based

upon other license agreements that were not produced in discovery.   Second, Covidien contends

that, regardless of that procedural deficiency, Passaggio cannot proffer an expert opinion about

the reasonable royalty rate because he makes no showing of comparability or technological

relevance of the other licenses referenced in his expert report.  Covidien is correct on both points.

### 1. __The Procedural Objection__

Covidien contends that Passaggio cannot proffer an expert opinion about the reasonable royalty rate because his opinion is based upon his recollection of other license agreements, which agreements were not produced in discovery. (ECF No. 91 at 11-12.)  As an initial matter, it is undisputed that Passaggio is unable to produce copies of the "Swiss" and "Italian" licenses referenced in paragraph 55 of his expert report, or any other licenses to which he more generally refers. (ECF No. 106 at 3-12.)  Given this fact, Covidien relies on the Court of Appeals for the Federal Circuit's decision in Siemens Med. Sol. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc., 637 F.3d 1269, 1286 (Fed. Cir. 2011), for the proposition that an expert cannot offer testimony based upon documents not produced in discovery because there is no "principled way to test [the expert's] recollection and opinion." (ECF No. 91 at 11-12; ECF No. 101 at 52; ECF No. 108 at 6-7; ECF No. 106 at 10.)  In Siemens, the expert sought to testify about scientific experiments he conducted years earlier when he was a government contractor, documentation of which could not be produced due to "national security matters." Siemens, 637 F.3d at 1286.  The district court held that the expert could not testify about this testing because documentation was not disclosed during discovery. Id. at 1286-87.  The court of appeals characterized the "court's evidentiary ruling [as] justified and well-reasoned." Id. at 1286. Siemens stands for the well-accepted notion that expert witnesses cannot testify about facts or data, but fail to disclose the same. Siemens, 637 F.3d at 1286; see Fed. R. Civ. P. 26(a)(2)(B).

In this case, Passaggio seeks to testify about the royalty rates paid, or being paid, by certain third-parties, but is unable to produce copies of the licensing agreements to which he refers.  Covidien is correct that controlling precedent, including Siemens, precludes Passaggio's testimony with respect to these royalty rates.

In its original opposition, Ravo argued that Federal Rule of Evidence 703 expressly permits Passaggio to testify about matters within his "personal knowledge and experience." (ECF No. 100 at 16-17)  Ravo relied upon <u>Graves v. Kemscop Grp., Inc.</u>, 864 F.2d 754, 757 (Fed. Cir. 1988), to support its assertion that "there is no absolute rule for documentary corroboration" of an expert witness' damages opinion. (ECF No. 100 at 16-17; ECF No. 107 at 5-6.)  In <u>Graves</u> the court of appeals affirmed a district court's order awarding civil contempt damages against a patent owner who violated a court order with respect to the content of its advertisements. <u>Graves</u>. 864 F.2d at 755.  In setting the amount of damages, the district court relied upon the testimony of one of the individual defendants about lost sales and profits, and did not require the witness to produce any supporting documentation. <u>Id.</u> at 756.  <u>Graves</u> did not address the kinds of documentary evidence necessary when an expert witness proffers an opinion about the reasonable royalty rate by referring to comparable licenses, and, therefore, is of limited utility to the court in resolving Covidien's objection.  Ravo also quoted liberally from the Court of Appeals for the Federal Circuit's decision in <u>Apple, Inc. v. Motorola, Inc.</u>, 757 F.3d 1286 (Fed. Cir. 2014), throughout its briefing. (ECF No. 100 at 13, 15; ECF No. 107 at 12-13.)  Although <u>Apple</u> includes an extended discussion of the "admissibility of damages expert discovery," <u>Apple</u>, 757 F.3d at 1313-26, the case did not involve any challenges based upon the failure of an expert to produce copies of comparable licenses, and, thus, provides no guidance in resolving the question before this court.

The court specifically asked the parties to address, in their supplemental briefing, "whether an expert can testify, from memory, concerning past transactions or situations in which he was involved or of which he is aware, without producing documentation, whether generally or in the specific context of a patent damages expert." (8/29/2014 Minute Entry.)  In response, Ravo

again cited Graves, stated that "Siemens is limited to its specific facts and is not broadly applicable in the manner argued by Covidien," and argued, for the first time, that Passaggio's testimony is not directed to Georgia-Pacific factor #2. (ECF No. 107 at 6.) Graves is readily distinguishable, as set forth above. Although Siemens is admittedly not on all-fours with the instant case, Ravo fails to explain why, other than by conclusory argument, its holding cannot be reasonably extended to the facts of this case. Ravo, more importantly, fails to cite any authority that dictates a result contrary to Siemens in this case. Ravo fails to satisfy its burden of establishing the admissibility of Passaggio's testimony by a preponderance of the evidence on these grounds. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 n.10 (1993).

Ravo is also unable to establish the admissibility of Passaggio's testimony on the ground that Passaggio is offering testimony about Georgia-Pacific factors #12 and #14, and not factor #2. (ECF No. 107 at 7-8.) This argument is presented for the first time in Ravo's supplemental brief, and directly contradicts arguments that Ravo previously made before this court, both in writing and at oral argument. For example, in its initial briefing, Ravo contended that Passaggio's expert opinion on damages was admissible because "[t]he Federal Circuit has 'held many times, [that] using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent.'" (ECF No. 100 at 16.) If Ravo's written submissions left any room for doubt, its presentation at the July Hearing repeatedly confirmed that Passaggio was offering expert testimony on the one Georgia-Pacific factor that involves "comparable licenses," i.e., factor #2. (ECF No. 101 at 36-37 (Ravo explaining that Passaggio is "not giving testimony on all of the Georgia-Pacific factors," but only the one that "has to do with comparable licenses") and at 62 (acknowledging that it is Passaggio's burden to present testimony that he views the other licenses as comparable as to technology); ECF No. 106 at 8 (Ravo agreeing that there must

be enough evidence for the court to determine comparability between licenses) and at 12 (Ravo contending that Passaggio can testify from personal memory that the "technology is comparable"); ECF No. 108 at 8-9.)  At no time in its original briefing or at oral argument did Ravo assert that Passaggio's testimony concerned <u>Georgia-Pacific</u> factor #12 or #14, instead of factor #2, even in the alternative.

Aside from the fact that Ravo's current position directly contradicts its previous position, the record does not support admission of Passaggio's testimony under either <u>Georgia-Pacific</u> factor #12 or #14.

*Factor #12:* <u>Georgia-Pacific</u> factor #12 inquires about "the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." <u>Georgia–Pacific</u>, 318 F.Supp. at 1120.  Passaggio's expert report uses language such as "very common," "commonly," "average," and "often," which could signify that the expert is offering testimony about customary industry practices and norms. (ECF No. 95-5 at 10 (¶¶ 55, 56).)  As Covidien points out, however, Passaggio specifically denied that he considered industry norms or customs in arriving at his expert opinion on damages. (ECF No. 108 at 11.)  As a result, Passaggio's expert opinion about these matters cannot be admissible for that purpose.

In any event, factor #12, like factor #2, requires an expert to establish that any industry customs are for "comparable businesses" and involve "analogous inventions." Comparability must be proven under factor #12, just as it must be proven under factor #2. Passaggio's opinion, therefore, even if proffered pursuant to <u>Georgia-Pacific</u> factor #12,

would suffer from the same deficiency with respect to comparability as does his opinion under factor #2. See supra Sec. III.D.2.

Factor #14: Ravo's contention that Passaggio's opinion can be offered pursuant to Georgia-Pacific factor #14, i.e., "opinion testimony of qualified experts," without requiring more, is illogical, and unsupported. According to Ravo, factor #14 "relates to an individual with experience in the industry providing an opinion as to what a reasonable royalty would be *based on their [sic] years of experience in the industry*." (ECF No. 107 at 8 (emphasis in original).) Ravo contends that because the testimony of experts Heilpern and Antoville was admitted in Georgia-Pacific, based only upon their personal experience, and without reference to, or production of, "any prior license agreements," Passaggio's testimony should be admitted in this case. (Id. at 8-11.) The facts of Georgia-Pacific are readily distinguishable and do not compel this court to admit Passaggio's testimony pursuant to factor #14.

Heilpern was the general counsel of defendant U.S. Plywood Corporation ("U.S. Plywood"), and "would have been personally and significantly involved in the decisions and negotiations concerning the hypothetical licensing of the" patent-in-suit. Georgia-Pacific, 318 F.Supp. at 1142. Antoville was U.S. Plywood's vice president of sales, and later president and chief executive officer, and "would have made the final decision concerning the hypothetical royalty to be negotiated with Georgia-Pacific." Id. Heilpern and Antville were permitted to proffer testimony, not because they had "years of experience in the industry," as Ravo contends, but because the court found that they were the actual individuals who would have engaged in a hypothetical negotiation with Georgia-Pacific on behalf of U.S. Plywood, making their testimony about the terms and

conditions that U.S. Plywood would have insisted on during that hypothetical negotiation uniquely probative. Id. at 1142-43. Neither witness testified about his generalized experience in the industry with other licenses, as Ravo now contends Passaggio can do in this case. Contrary to Ravo's belated contention, Georgia-Pacific does not support the admission of Passaggio's testimony in this case pursuant to Georgia-Pacific factor #14.

Under these circumstances, Ravo's after-the-fact assertion that Passaggio is not offering testimony about comparable licenses under Georgia-Pacific factor #2, but is proffering an expert damages opinion pursuant to factor #12 or #14 is without merit. Passaggio's expert report proffers an opinion pursuant to Georgia-Pacific factor #2 and will be analyzed under the standards applicable to that factor.[3]

Returning to Covidien's procedural objection to Passaggio's testimony, because Passaggio is unable to produce documentation regarding the purportedly comparable "Swiss" and "Italian" licenses to which he refers in his expert report, Covidien's objection will be sustained. Ravo presents no authority to this court that would allow Passaggio to testify about the terms of the "Swiss" and "Italian" licenses without producing copies of them to Covidien, in contravention of the general rule that all supporting facts and data be produced with the expert report. Any reference to either license in Passaggio's expert report will be stricken for this reason.

---

[3] Perhaps the best evidence of this fact is that Passaggio acknowledges in his report that a prior license agreement between Ravo and Ethicon for the '148 Patent is not "indicative of a reasonable royalty" because it was the "result of settlement of a prior infringement lawsuit." (ECF No. 95-5 at 10 (¶ 57)); LaserDynamics, 694 F.3d at 77-78 (settlement agreements do not provide an accurate reflection of what a willing licensor would do in a hypothetical negotiation).

## 2. **The Substantive Objection**

Covidien also contends that Passaggio cannot proffer an expert opinion about damages because he makes no showing of comparability or technological relevance of the other licenses referenced in his expert report. (ECF No. 91 at 12-13.) Ravo did not respond to this objection in its original opposition brief. (ECF No. 100.) At the July Hearing, Ravo asserted that the other licenses were comparable because Passaggio could testify that they were in the "medical device industry," and, relying on the Court of Appeals for the Federal Circuit's recent decision in Apple, argued that "whether the licenses are sufficiently comparable…goes to the weight of the evidence." (ECF No. 101 at 36-37, 61-63.) When Ravo reported at the August Hearing that Passaggio was unable to obtain copies of the "Swiss" and "Italian" licenses referenced in his expert report, the court ordered the parties to submit supplemental briefing identifying what evidence of record satisfies Ravo's burden to prove that the other licenses relied upon in Passaggio's expert report are sufficiently comparable to the hypothetical license negotiation. (8/29/2014 Minute Entry.)

Instead of identifying such evidence, Ravo argues in its supplemental brief that "Covidien's entire argument on 'comparability' of the licenses is a red herring" because Passaggio is not offering testimony with respect to Georgia-Pacific factor #1 or #2. (ECF No. 107 at 7.) The court previously discussed, and rejected, Ravo's after-the-fact position that Passaggio's expert opinion was being made with respect to Georgia-Pacific factor #12 or #14. See supra Sec. III.D.1. The only plausible understanding of Passaggio's expert report, and the arguments made by counsel, is that Passaggio is testifying with respect to Georgia-Pacific factor #2, i.e., comparable licenses. As explained above, in any event, Ravo would have to demonstrate comparability even if Passaggio were to offer testimony pursuant to Georgia-Pacific factor #12.

Ravo declined the court's directive to identify evidence that could support a finding of comparability. The entirety of Ravo's evidence in support of Passaggio's proposed expert testimony about comparable licenses is, therefore, the information reflected in his expert report, and counsel's conclusory argument that the other licenses are comparable because are they are in the "medical device industry." This evidence is insufficient to carry Ravo's burden to demonstrate a "minimum threshold" of comparability with respect to technology, economic terms, and time period. Apple, 757 F.3d at 1315 (citing i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831, 854 (Fed. Cir. 2010)); Lucent, 580 F.3d at 1325; CMU, 2012 WL 3686748, at * 4. Although it is true that distinctions and oversights concerning other licenses are matters for cross-examination, it is the expert's duty to make a threshold showing that there is some "discernible link between the comparable license and the claimed technology." CMU, 2012 WL 3686748, at * 4 (citing ResQNet.com, 594 F.3d at 870).

Apple, the decision repeatedly relied upon by Ravo in support of its contention that "whether the licenses are sufficiently comparable…goes to the weight of the evidence, not its admissibility," demonstrates that an expert must make a minimum threshold showing of comparability in order to testify. That case involved a patent infringement dispute between two competing smartphone manufacturers, Motorola and Apple. Motorola proffered expert testimony concerning the hypothetical negotiation and comparable licenses. Apple, 757 F.3d at 1323. The expert relied upon license agreements between a) defendant Motorola and all major cellular phone makers (except Apple) for a patent portfolio that included one of the patents-in-suit; and b) Apple and third parties for the same cellular communications technology. Id. All these agreements involved one of the two named parties, and either one of the patents-in-suit or the same technology. Having made that threshold showing of comparability, the court of appeals deemed

the expert testimony admissible, and stated that "whether these licenses are sufficiently comparable *such that Motorola's calculation is a reasonable royalty* goes to the weight of the evidence, not its admissibility." Id. at 1326 (emphasis added).

In contrast, in this case, Passaggio does not articulate how the other licenses referenced in his expert report are comparable to the hypothetical negotiation. None involve Ravo or Covidien, other than the Ravo-Ethicon license referenced in paragraph 57 of Passaggio's expert report, which he disregards as a basis for setting a reasonable royalty because it was a settlement agreement. (ECF No. 95-5 at 10 (¶ 57).) Although there appears to be some link between the "Italian" license, which is for a device that treats hemorrhoidal disease with the same effect as Covidien's device, and the hypothetical negotiation, Ravo fails to submit sufficient evidence from which the court could make a final determination on that matter. (ECF No. 95-5 at 10 (¶ 55).) Passaggio fails to make any threshold showing of technical comparability with respect to the "Swiss" license, which is for "a new inguinal hernia prosthesis." (Id.)

The court is unable to make any determination about temporal comparability. Ravo provided the court with no evidence about when the hypothetical negotiation would have taken place.[4] LaserDynamics, 694 F.3d at 75 (citing decisions). There is likewise no information in Passaggio's expert report, or otherwise in the record, concerning the operative dates of the other licenses about which Passaggio seeks to testify. Although Passaggio refers to the "Italian" license in the present tense, arguably assigning some time-frame to that license, he refers to the "Swiss" license in the past tense. (ECF No. 95-5 at 10 (¶ 55).) Given that Passaggio's career spans decades, there is no plausible way for the court to assess the effective date of the "Swiss" license. Without any information by which the court can establish the date of the hypothetical negotiation,

---

[4] Although of no present evidentiary weight, publicly available documents indicate that Covidien released the accused product to market in May 2010.

or of the other licenses, the court is unable to make any assessment of the temporal comparability of the licenses referenced in Passaggio's expert report.

Although Passaggio makes no specific averment concerning the comparability of the economic terms of the other licenses to which he refers and the hypothetical negotiation, his expert report sheds some light on that issue. The terms of the "Swiss" license appear to be relatively comparable, in that an up-front payment is made, followed by a royalty that decreases after some time. (ECF No. 95-5 at 10 (¶ 55).) The terms of the "Italian" license, which does not include an up-front payment, and accordingly pays a much higher royalty, do not appear to be economically comparable. (Id.) Of course, the court's assessment of these matters must rely entirely on the information disclosed by Passaggio in his expert report, because copies of the actual license agreements are not available. Passaggio made an insufficient showing of comparability with respect to economic terms.

Ravo fails to meet its burden to demonstrate a "minimum threshold" of comparability or some "discernible link" between either the "Swiss" or the "Italian" license and the hypothetical negotiation. Apple, 757 F.3d at 1315 (citing i4i, 598 F.3d at 854); Lucent, 580 F.3d at 1325; CMU, 2012 WL 3686748, at * 4 (citing ResQNet.com, 594 F.3d at 870). Having failed to make this threshold showing, the "Swiss" and "Italian" licenses cannot be relied upon to support Passaggio's expert opinion with respect to the reasonable royalty rate.

The remainder of Passaggio's expert damages opinion consists of his generalized statements about "common" or "average" royalty rates or negotiating tactics. (ECF No. 95-5 at 10 (¶¶ 55, 56).) The expert report refers only generally to licensing in the fields of "orthopedic implants" and "medical device manufacturers," but does not reference any other specific license. (Id.) The field of "orthopedic implants" bears no facial similarity to the technology at issue in this

case.  The field of "medical devices" is broad, and could encompass devices with, and without, technical similarity to the technology at issue in this case.  The court is unable to make any assessment of comparability based upon Ravo's generalized references to these fields.  As noted above, although Passaggio's use of terms such as "often," and "commonly," and "average" might indicate that his opinion is directed to customary industry practices, i.e., <u>Georgia-Pacific</u> factor #12, Passaggio explicitly denies that his testimony is directed to such matters. (ECF No. 108 at 11.)  Even if Passaggio had not made this concession, factor #12 also includes a comparability requirement, which Ravo has not satisfied, for the reasons stated above.

Covidien's objection to Passaggio's expert opinion about damages on the ground that he fails to make the required threshold showing of comparability is sustained.  Ravo is incorrect that it need not make such a showing.  Ravo is likewise incorrect that it can satisfy the comparability requirement with only Passaggio's general declaration that the other licenses are in the "medical device field."  Any specific statement of technological comparability made in Passaggio's expert report about the "Italian" license is insufficient, especially in light of the fact that Passaggio fails to establish any temporal or economic link to the hypothetical negotiation.  For these reasons, paragraphs 54 through 58 will be stricken from Passaggio's expert report.

### IV.  <u>Conclusion</u>

For the reasons set forth above, Ravo's motion challenging Bolanos' expert opinion that Claim 9 is not enabled, (ECF No. 88), is granted, in part.  Paragraph 103 and the last sentence of paragraph 104 shall be stricken from Bolanos' report. (ECF No. 89-1 at 42-43 (¶¶ 103, 104).)  Bolanos will be permitted to testify in accordance with the other opinions set forth in his report.  The remainder of Ravo's motion was ruled upon at the July Hearing. (ECF No. 101 at 5, 12-14, 15.)

For the reasons set forth above, Covidien's motion challenging Passaggio's expert opinion regarding the reasonable royalty rate for a license under the '148 Patent, (ECF No. 90), is granted. Paragraphs 54 through 58 shall be stricken from Passaggio's expert report. (ECF No. 95-5 at 10-11 (¶¶ 54-58).) Covidien's motion challenging Passaggio's expert opinion that the asserted claims of the '148 Patent are valid and infringed, (ECF No. 93), was ruled upon at the July Hearing. (ECF No. 101 at 27-28, 69, 86-87.)

Dated: October 24, 2014                                  BY THE COURT,

                                                         /s/ *Joy Flowers Conti*
                                                         Joy Flowers Conti
                                                         Chief United States District Judge